AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>MARKHAM BOND,<br><br>Defendant. | Case No.  2:23-mj-06083-DUTY |

**FILED**
CLERK, U.S. DISTRICT COURT
11/27/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___jb___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 18, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1951 | Interference with Commerce by Robbery |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Gary Wallace
*Complainant's signature*

Gary Wallace, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  November 27, 2023

*(Judge's signature)*

City and state:  Los Angeles, California

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Haoxiaohan Cai, x0762

**AFFIDAVIT**

I, Gary Wallace, being duly sworn, declare and state as follows:

## I.     INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2017. I am presently assigned to the Los Angeles Field Office, where I am responsible for investigating violent crimes, including bank and armored car robberies, murder, extortion, interstate threats, kidnappings, and other violations of federal statutes. As a Special Agent, I have received extensive training regarding federal criminal law. I completed 21 weeks of training at the FBI Academy located at Quantico, Virginia, where I received training in federal robbery and theft-related laws, identification and investigation of organized robbery crews, and various surveillance and investigative techniques related to violation of federal law, including bank robbery and other violent crimes. I regularly refer to these laws during the course of my duties and have written and participated in the execution of several state and federal search and arrest warrants in violation of these laws.

2. During the course of my employment with the FBI, I have participated in investigations that employed various investigative techniques, including witness interviews, review of video surveillance, and collection of physical evidence. Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by

1

bank robbers to take money by force and/or intimidation.  I am also familiar with how robbers use digital devices to facilitate and conceal their crimes.

## II. PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of a criminal complaint and arrest warrant against MARKHAM DAVID BOND ("BOND") for a violation of Title 18, United States Code, Section 1951 (Interference with Commerce by Robbery).

4.   This affidavit is also made in support of an application for a warrant to search a Samsung cell phone with a dark blue case, seized from BOND during his arrest (the "SUBJECT DEVICE"), that is currently in the custody of the Los Angeles Police Department, in Los Angeles, California, as described more fully in Attachment A.

5.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1951 (Interference with Commerce by Robbery), 924(c) (Use of a Firearm in Furtherance of a Crime of Violence), and 922(g) (Felon in Possession of a Firearm), as described more fully in Attachment B (the "Subject Offenses").

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or

investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

7. On August 18, 2023, at approximately 10:20 a.m., BOND robbed a BRINKS U.S. armored carrier truck in front of the Chase Bank branch located at 8813 South Sepulveda Boulevard, Los Angeles, California 90045 (the "Chase Bank"). During the robbery, BOND, armed with what appears to be a pistol and fully clothed with a gaiter face mask to conceal his identity, verbally demanded money from the BRINKS courier with initials D.M. while pointing a handgun at the victim. BOND took the victim's blue BRINKS duffle bag, which contained $145,000.00 in U.S. cash, forced D.M. to get on the ground at gunpoint, and fled the scene.

8. As discussed below, significant evidence showing BOND committed the robbery was later recovered from both BOND's residence and the getaway vehicle used to flee the crime scene, including a blue BRINKS duffle bag, an NFL Raiders hat, a blue neck gaiter face mask, and additional clothing items that matched what the robber wore during the robbery. The LAPD tested DNA obtained from the Raiders hat which returned a match to BOND.

9. At the time of the bank robbery, BOND was on supervised release in United States v. Bond, 2:94-CR-00563-JAK, where he was sentenced to 562 months imprisonment after a jury found him guilty of two counts of Hobbs Act robbery, in

violation of 18 U.S.C. § 1951, two counts of armed robbery, in violation of 18 U.S.C. § 2113(a), (d), and two counts of using or carrying a firearm during a crime of violence, in violation of 18 U.S.D.C. § 924(c).  Based on my review of Court documents, BOND appears to have been convicted for similar conduct.  For example, according to the Court's minute order on January 12, 2022, BOND had "pointed a firearm at armored car couriers, and pointed a gun at the head of one victim."  (2:94-CR-00564-JAK, Dkt. 259, at 6.)

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my conversations with other law enforcement agents, and review of law enforcement reports and surveillance images and video, I am aware of the following:

### A. August 18, 2023 Robbery of Brinks U.S. Armored Vehicle outside of a Chase Bank in Los Angeles

11. On August 18, 2023, at approximately 10:43 a.m., law enforcement responded to a robbery call of a BRINKS armored vehicle.  Police dispatch advised that the victim, D.M., a BRINKS armored carrier employee, was robbed at gunpoint outside of the Chase Bank at 8813 South Sepulveda Boulevard in Los Angeles, CA.  The suspect was a lone male who stole a blue BRINKS bag containing approximately $148,000.00 in U.S. cash, while a different BRINKS employee C.H. observed the robbery from inside of the armored vehicle.  Based on law enforcement's

interviews of the victim and the witness, I learned the following:

      a.   The armored vehicle was parked in the Chase Bank parking lot in front of the bank.  D.M. exited the vehicle with a blue BRINKS duffle bag on a rolling cart containing $145,000.00 in U.S. cash that was to be delivered to the bank.  While D.M. was in between the armored vehicle and the bank, a man, later identified as BOND, approached D.M. on foot from the front, pointed a handgun at D.M. and said, "I got you bro, drop it," and, "Don't try nothing."  In fear for his life, D.M. dropped the BRINKS duffle bag.  The robber ordered D.M. to the ground, and D.M. held out both of his hands and backed away from the robber.  D.M. then got onto the ground on his hands and knees while the robber continued to point his handgun at D.M.  The robber then approached and grabbed the blue BRINKS duffle bag, backed away and fled northbound on Sepulveda Boulevard.  The below are two screengrabs from a video taken from BRINKS, first, showing the robber point what appeared to be a handgun at the victim, and the second, showing the robber pointing the gun in his right hand, holding a bag in his left, and the victim kneeling on the ground.

 

      b.   The victim and witness described the robber as a black male, approximately six (6) feet tall, weighing approximately 180 pounds, wearing a black jacket with a white logo, light blue jeans, a black baseball cap with a white logo, sunglasses, and a dark colored face mask.

    12.  Following the robbery, the LAPD canvassed the area surrounding the crime scene and located a witness with initials K.J., who was on La Tijera Boulevard near the bank when the robbery occurred.  I have reviewed the witness interview included in the police report and learned that the K.J. witnessed a black male wearing a hat and carrying a bag running

6

westbound on La Tijera Boulevard and appearing to be out of breath. The male then entered the driver seat of a green older model Chevrolet Tahoe SUV, and he drove eastbound on La Tijera Boulevard and then turned northbound on Sepulveda Boulevard and continued driving until he was out of sight.

13. Following the robbery, the LAPD canvassed the area surrounding the crime scene and located surveillance cameras on adjacent buildings. I have read police reports and observed surveillance video and I learned the following:

    a. A dark older model Chevrolet Tahoe with distinctive silver and dark wheels, and damage/repair to the middle passenger side window, and matching the description of the getaway vehicle, drove into a parking lot near the Chase Bank on the morning of August 18, 2023. While driving into the parking lot, shortly before the robbery occurred, the vehicle passed by a Culver City public transportation bus.

    b. The surveillance video shows the robber, a black male, average height and build, wearing a black jacket with a white Adidas logo, a red/maroon long sleeve shirt underneath, light blue jeans, a black baseball cap with a white Raiders NFL logo, sunglasses, and white sneakers, and matching the description of the robber, parked his vehicle, i.e., the darker older model Chevrolet Tahoe, on the west side of a building, and that the robber walked on the north side of the bank building to the east side, and waited for a BRINKS armored vehicle to park. While waiting, the robber had his face exposed below his sunglasses. The robber then pulled up his blue gaiter face mask

7

to cover his face and neck below his sunglasses.  The following pictures are screenshots taken from the surveillance video depicting the robber, whose visible facial features matched BOND based on a comparison to his booking photographs:

 

   c. At approximately 10:25 a.m. the robber, pulled out a concealed black pistol while walking by the Chase Bank on Sepulveda Boulevard.  The robber approached D.M. from the front and pointed his pistol at D.M., who dropped a cart which held a dark duffle bag.  The robber grabbed the duffle bag from the ground while D.M. held his hands in the air.  The robber continued to point his handgun at D.M. while backing away, and D.M. got on the ground.  At approximately 10:26 a.m., the robber ran in the opposite direction northbound on Sepulveda Boulevard and then westbound on La Tijera Boulevard, carrying a duffle bag.  The robber re-entered his vehicle and fled the area.

**B.  LAPD Identified and Located the Getaway Vehicle in Inglewood, California**

14.  The LAPD obtained surveillance video from the City of Culver City that was recorded on the bus near the getaway vehicle on the day of the robbery.  The video captured the vehicle's front license plate, which was a California license plate that had partial number 5\*\*J\*77.

15.  Using agency resources, the LAPD identified a possible match to the getaway vehicle's partial license plate number of 5NHJ677.  The LAPD obtained The CA Department of Motor Vehicle ("DMV") records identified the license plate as assigned to a 2005 Chevrolet Tahoe (hereinafter "the TAHOE") and registered to a male with initials E.A. in San Bernardino, California, who did not match the robber's description.

16.  On August 28, 2023, LAPD Patrol Officers saw the TAHOE parked in front of 924 Hillcrest Boulevard, Inglewood, California, within a few miles of the Chase Bank.  The officers conducted a visual inspection of the TAHOE and did not see anyone inside the vehicle.  The officers observed in plain view, a beer can in the front passenger seat and a BRINKS duffle bag and a pair of white New Balance sneakers in the backseat.  The BRINKS duffle bag was consistent with what was stolen during the robbery, and the sneakers were consistent with what the robber wore.  The LAPD impounded the TAHOE under the suspicion that it was the getaway vehicle from the robbery.

17. The LAPD obtained a state search warrant for the TAHOE and recovered several items consistent with the robbery and the robber's clothing, including the following:

    a. A black ball cap with a white Raiders NFL logo on the front;

    b. A black windbreaker;

    c. A blue gaiter face mask;

    d. A pair of white sneakers;

    e. Sunglasses;

    f. A blue BRINKS duffle bag.




### C. The LAPD identified BOND as the Robber

18. The LAPD Laboratory tested the evidence for DNA and DNA from the Raider's hat generated a match to BOND, who had an FBI number. On November 8, 2023, the FBI Laboratory confirmed to the LAPD Laboratory that DNA sample was a match to BOND, Federal Bureau of Prisons number 78823-012, and his last known whereabouts were with the U.S. Probation & Parole Office in Inglewood, California, and his release date from supervised

release was January 31, 2034.[1]  An LAPD officer spoke with BOND's assigned federal probation officer and provided a still photograph of the robber from surveillance footage, and the probation officer advised she had contact with BOND and recognized him in the photograph.

    19.  The LAPD obtained BOND's CA DMV records, which revealed his address as of November 2022 as an address in Inglewood, CA 90301.  This address was 0.1 miles from the location where the LAPD located the TAHOE.  I have observed BOND's DMV records and photo and observed that he is a black male, six (6) feet, zero (0) inches tall and weighing 200 pounds, and his DMV photo appears consistent with the surveillance images of the robber.

    20.  The LAPD obtained BOND's criminal records, which included, among other things, felony convictions in 1994 in U.S. District Court for the Central District of California, case number 2:94-CR-00563-JAK, and they obtained documents in that case.  I have reviewed these records and learned the following:

        a.  In 1994, was BOND convicted of multiple counts, including armed robbery of an armored carrier and armed bank robbery.  He was sentenced to 46 years and 10 months in prison, and 12 years of supervised release.

        b.  In 2021, BOND applied for compassionate release from federal custody.  In January 2022, BOND was ordered released from federal prison after 26 years, and started a 12-

---

[1] As discussed below, BOND was released from custody early pursuant to a compassionate release order entered by the Court in 2022.

11

year term of supervised release, which he had served less than two years at the time of the robbery.

   c. BOND was convicted after jury trial for "very serious" offenses and was sentenced to 562 months imprisonment. According to the Court's minute order ruling on compassion release on January 12, 2022, BOND had "pointed a firearm at armored car couriers, and pointed a gun at the head of one victim." (2:94-CR-00564-JAK, Dkt. 259, at 6.) BOND wrote in a letter to the Court that he took full responsibility for his crimes and was committed to "build[ing] a safe, law-abiding life outside prison." (Id. at 7.)

  **D. The LAPD Arrested BOND and Searched his Residence on November 22, 2023**

 21. The LAPD obtained a California arrest warrant for BOND for violation of California Penal Code 211, Robbery, for the above-mentioned armed robbery, and a California search warrant for his residence. On November 22, 2023, the LAPD located and arrested BOND at this residence in Inglewood. During the arrest, the LAPD seized a Samsung cell phone with a dark blue case from BOND, i.e., the SUBJECT DEVICE, which based on my discussion with LAPD officers, is currently maintained in LAPD custody and associated with Police Report Number 231415989.

 22. The LAPD interviewed BOND following his arrest, and he denied all responsibility for the crime as well as being in the TAHOE. The LAPD also searched BOND's residence and located several items of evidence including the following:

a.   A dark .40 caliber pistol, made by Springfield, bearing serial number XD580867, with a 12-round capacity magazine loaded with 10 live rounds of ammunition;

b.   A red/maroon long sleeve shirt;

c.   Crumpled U.S. cash, multiple denominations, totaling $9,005.00, located inside multiple plastic bags hidden inside of a mini-refrigerator.

  

23.   The red/maroon shirt is consistent in appearance with what the robber was wearing on the day of the robbery.

V.   **TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

24.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual

13

who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

      b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful possession of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

25. As used herein, the term "digital device" includes the SUBJECT DEVICE.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

15

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 2. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

  a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

  b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of

16

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII. CONCLUSION

27. For all the reasons described above, there is probable cause to believe that BOND violated 18 U.S.C. § 1951 (Interference with Commerce by Robbery).

28. Additionally, there is a fair probability that fruits, evidence, or instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICE.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 27th day of
November, 2023.

_____
THE HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

17